UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VIOLA BRIGGS
104 Irvington Street, SW, Apt. 303
Washington, DC 20032

     and

FRANK BRIGGS
2855 Bladensburg Road, NE, Apt. 528
Washington, DC 20018

        Plaintiffs,

   v.

THE DISTRICT OF COLUMBIA
1350 Pennsylvania Avenue, NW
Washington, DC 20004

MPD SGT. SETH R. ANDERSON
300 Indiana Avenue, NW
Washington, DC 20001,

MPD SGT. TIFFANI D. COWAN
(Badge #S0433)
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER ANDREW J. TURNER IV
(Badge #537)
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER SIDNEY L. CATLETT
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER JAMES H. LITTLE
(Badge #2198)
300 Indiana Avenue, NW
Washington, DC 20001,

No. _____

JURY TRIAL DEMANDED

MPD OFFICER HODGES
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER KIERNAN A. SPEIGHT
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER WILLIE I. GALTNEY III
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER BROWN
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER KIM TOGANS
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER O'BANNON
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER PLUMLEY
300 Indiana Avenue, NW
Washington, DC 20001,

MPD OFFICER J. MCELHENNY
(Badge #2477)
300 Indiana Avenue, NW
Washington, DC 20001

   Defendants.

## **COMPLAINT**

   Plaintiffs Viola Briggs and Frank Briggs bring this civil rights action under 42 U.S.C. §

1983 for damages and other appropriate relief for redress of violations of their rights under the

Fourth Amendment to the United States Constitution and bring a common law tort claim for the

negligent infliction of emotional distress.

## INTRODUCTION

1.      On the evening of January 20, 2012, Plaintiff Viola Briggs and her brother, Plaintiff Frank Briggs, were startled by a violent bang on the door of their apartment, a shout of "Police - Open up!," and a moment later, the sound of a battering ram crashing through the apartment's metal door.  Thirteen police officers rushed into the apartment.  The Officers pointed their weapons at Plaintiffs, ordered them to lie face down on the ground, and handcuffed Plaintiffs behind their backs.  In the process, Mr. Briggs, a then-55-year-old man with a bad back, could not lower himself to the floor quickly enough for the Officers and one Officer shoved him down from behind.  Shortly after making their violent entry, the Officers realized that they were in not in an apartment from which drugs were being sold, yet the Officers kept the plaintiffs handcuffed and the Officers continued searching the apartment.  Although the Officers had a search warrant, the method of executing that warrant made their actions unlawful.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343 over Plaintiffs' claims brought under 42 U.S.C. § 1983 to vindicate their rights established by the Fourth Amendment to the United States Constitution.  This Court has supplemental jurisdiction to adjudicate Plaintiffs' common law tort claim under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy and arose out of the same transaction and occurrence as Plaintiffs' federal claims.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the Plaintiffs' claims occurred in the District of Columbia.

## PARTIES

4.      Plaintiff Viola Briggs is a 57-year-old mother of three and grandmother of nine who worked most of her career as a paralegal.  She currently resides, and resided at the time of the January 20, 2012, search, at 104 Irvington St. SW, Apt. 303, Washington, DC 20032.

5.      Plaintiff Frank Briggs is Ms. Briggs' 58 year-old brother.  Since injuring his back while working in 2006, Mr. Briggs suffers from debilitating back pain and stiffness and receives disability benefits.  At the time of the search, he resided with his sister at 104 Irvington St. SW, Apt. 303, Washington, DC.  He currently resides at 2855 Bladensburg Road, NE, Apt. 528, Washington, DC 20018.

6.      Defendant the District of Columbia is the municipal entity that operates the Metropolitan Police Department ("MPD") which trains and supervises the Defendant Officers.

7.      Defendants Sgt. Anderson, Sgt. Cowan, Officer Turner, Officer Catlet, Officer Little, Officer Hodges, Officer Speight, Officer Galtney, Officer Brown, Officer Togans, Officer O'Bannon, Officer Plumley and Officer McElhenny are or were at the time of the January 20, 2012, search of Plaintiffs' apartment, sworn officers employed by the MPD.  At all times relevant to this complaint, these Defendants were acting under color of law and within the scope of their employment.  They are sued in their individual capacities.  In this Complaint, "Officers" refers to one or more of the Defendant Officers.

## FACTS

**A.  The Officers Acted Unlawfully While Executing A Search Warrant (That Was Based on a Confidential Informant's Inaccurate Information).**

8.      Officer Turner applied for a search warrant for 104 Irvington St. SW, Apt. 303, Washington, D.C., on the afternoon of January 20, 2012.  The Affidavit he submitted in support

of the application stated as the basis for the warrant an alleged controlled marijuana buy carried

out by a Confidential Informant within the previous 72 hours.

9.     According to Officer Turner's Affidavit, officers took the Confidential Informant

to the 100 block of Irvington Street, SW and provided him with funds.  There, the Affidavit

states, the Confidential Informant "was met by an unknown black male in front of 104 Irvington

Street, SW," with whom the Confidential Informant had a brief conversation.  The unknown

black male then led the Confidential Informant inside the building that the Confidential

Informant later identified to Officer Turner as 104 Irvington St., SW, and up to the third floor

landing.

10.     The Affidavit states that the Confidential Informant told Officer Turner that the

unknown man told him to remain on the landing while the man entered an apartment identified in

the Affidavit as apartment 303.  According to the Confidential Informant, the unknown man

returned to the third floor landing a short time later with what the Affidavit refers to as a "usable

quantity of a green weed like substance" and handed it to the Confidential Informant in exchange

for funds of an unspecified quantity from the Confidential Informant.

11.     Officer Turner's Affidavit then states that the Confidential Informant came to

where Officer Turner was waiting and "handed the usable quantity of green weed over to Officer

Turner."  The Affidavit states that the substance handed to Officer Turner was field tested and

the results indicated that the substance was positive for THC (the primary psychoactive

ingredient in marijuana).

12.     On information and belief, Officer Turner did not personally observe the

Confidential Informant and the unknown black male enter 104 Irvington St; Officer Turner did

not personally observe the Confidential Informant and the unknown black male go up to the third

floor landing; Officer Turner did not personally observe the unknown black make enter any apartment, and certainly did not observe the unknown black male enter apartment 303; and Officer Turner did not attempt to corroborate any of the information provided by the Confidential Informant.

13.     On the basis of this single event in which a Confidential Informant allegedly purchased a "usable quantity of a green weed-like substance," Officer Turner stated in his Affidavit that there was probable cause to believe that within 104 Irvington Street, Apartment 303 there resided someone who possessed "illegal substances, particularly crack cocaine, paraphernalia related to drug- packaging, sale, production, and use, the proceeds of drug sales, and documents and other items evidencing the trafficking in illegal narcotics."

14.     The Affidavit did not:

a.   Explain why a single purchase of a "usable quantity" of marijuana provided probable cause to believe that there was crack cocaine in the apartment;

b.   Provide any corroborating statements or evidence that tended to support the proposition that any drugs had been sold or were being sold out of apartment 303 at 104 Irvington Street at any time prior to the police raid;

c.   Provide any physical description or other information about the identity of the "unknown black male" who was the only individual identified in the Affidavit as having allegedly sold marijuana, including whether he was a target of the investigation and what, if anything, anyone within the MPD knew or attempted to find out about his identity, his history, his connection to 104 Irvington Street, Apartment 303, or where he resided;

    d.  Describe any efforts to investigate the identity or description of, or information about, the residents of apartment 303;

    e.  Describe whether the "numerous drug related arrests" with which the Affidavit states the Confidential Informant was involved were found to have been supported by probable cause or led to convictions, or describe the Confidential Informant's role in those arrests; or

    f.  Include any actual facts relating to apartment 303 – as opposed to cut-and-paste generic allegations and conclusions – that would provide probable cause to believe that apartment 303 contained weapons or that the persons who may be in the apartment posed any threat to police officers.

15.    Search warrant #2012CRW00204, issued by the D.C. Superior Court on January 20, 2012, based on Officer Turner's Affidavit, sought "[m]arijuana, illegal drugs, paraphernalia, records, papers [r]elating to the distribution or possession of narcotics, papers relating to the accumulation or disposition of assets derived from narcotics-trafficking, papers relating to the ownership or occupancy of the above-described premises."

16.    The warrant did not:

    a.  Authorize no-knock entry;

    b.  Include weapons among the list of items to be searched for and seized, or otherwise indicate to officers executing the warrant that there was probable cause to believe that any weapons were present in the home; or

    c.  Indicate to officers executing the warrant that any individuals likely to be present in apartment 303 had a history of violence or a likelihood of responding to officers with violence.

**B.  Defendants Demand Entry and in the Next Moment Break Down Plaintiffs' Apartment Door with a Battering Ram.**

17.     Plaintiff Viola Briggs and her brother Plaintiff Frank Briggs moved into Apartment 303 in late October of 2011, less than three months before the search.

18.     On the evening of January 20, 2012, Plaintiffs were relaxing in their apartment. Mr. Briggs, who had been in the apartment's second bedroom watching a movie, stood up and headed toward the kitchen to get a drink of water.  Ms. Briggs had just finished watching a television program on her computer in her living room.  While standing up she saw on the clock that it was 7:15 p.m.  She began walking toward the hallway that leads to the apartment's two bedrooms which, from where she had been sitting, meant that she was walking toward the apartment's front door.  Just as Ms. Briggs began to walk, she heard a very loud "boom," like a fist pounding on the door, then a voice shouting, "Police! Open up!"

19.     Already facing the door and headed in its direction, Ms. Briggs continued moving to the door in response to this demand.  But she was unable to take even one full step toward it before Officers burst through the front door with a battering ram.

20.     At most, only two to three seconds passed between the loud bang on the front door and the Officers ramming in and breaking down the door.

21.     Officers later completed a "Report of Forcible Entry" concerning their breaking into the apartment.  That report, which identifies Sergeant Seth Anderson of 7D Vice as the official in charge at the scene, identifies "ram to front door" as the method of entry.  In describing the incident, the report states in conclusory fashion:  "A knock-and-announce was performed to indicate the police presence and intent.  After hearing no response from inside and waiting a reasonable time, the door was forced open with a battering ram."  No further specifics are included regarding the knock and announce or the amount of time the Officers waited.

22.     In fact, the Officers did not wait a reasonable amount of time—by any measure of what would be "reasonable."  Only a brief moment—no more than two or three seconds—elapsed between the Officers announcing their presence and making their forceful entry.

23.     Waiting a reasonable amount of time to be granted admittance would not have been futile, as Plaintiffs would promptly have opened the door for the police.  Indeed, Ms. Briggs was already standing, facing the door, and headed in that direction.  It would be hard to imagine a person more ready to promptly reach the door and open it for the Officers.  And she was not only ready—she was willing: Upon hearing the loud bang at the door and the Officers' demand to open up, Ms. Briggs fully intended to continue straight toward the front door, and to open the front door in response to the Officers' demand.  But due to the Officers' failure to allow Ms. Briggs a reasonable amount of time to respond to their demand to open the door, she was deprived of the opportunity to do so.  The Officers broke down the door before she could take even one single full step toward it.  Plaintiffs did not actively or constructively refuse the Officers admittance.

24.     Waiting a reasonable amount of time to be granted entry into the apartment would not have created a risk of violence.  No exigent circumstances existed that necessitated the immediate forceful entry.  Nor did the Officers believe, or have any reason to believe, that there were exigent circumstances necessitating an immediate entry.

25.     The Officers also failed to announce their purpose or intent to execute a search warrant as part of their "knock and announce" prior to breaking down the door, despite the description in the Report of Forcible Entry that "[a] knock-and-announce was performed to indicate the police presence and intent."  Ms. Briggs heard only: "Police – Open up!"  It was not until after the Officers were in the apartment, the Plaintiffs had been handcuffed and put on the

ground, the search underway, and Ms. Briggs repeatedly asking what was going on that the

Officers finally told Plaintiffs why they were there.

**C.** **Officers Employ Excessive Force In Restraining Plaintiffs While Searching the Apartment.**

26.     The Officers—there were 13 in all, many whose faces were covered with what

appeared to be ski masks—invaded the apartment, with Officers pointing their guns at the

Plaintiffs.  The Defendants immediately ordered Ms. Briggs and Mr. Briggs to lie on the ground.

27.     Ms. Briggs and Mr. Briggs both immediately attempted to comply with the order.

28.     Mr. Briggs, who has debilitating back pain, was easing himself down as best as he

could manage and explaining to the Officers about his back when a male Officer shoved him

from behind down to the floor.

29.     Lying face down on the floor, and with the Defendants' weapons still drawn and

pointed at them, Plaintiffs were handcuffed behind their backs.

30.     The Defendants continued pointing guns directly at Ms. Briggs and Mr. Briggs

until after each was handcuffed even though the Briggs were already lying face down on the

ground, were heavily outnumbered, and had throughout been completely compliant to the

demands of the Defendants.

31.     Despite their overwhelming numbers, the Officers made no attempt to use any

less forceful means to detain Ms. Briggs or Mr. Briggs before pointing their guns at the

Plaintiffs, forcing them to lie prostrate on the ground, and handcuffing them.  At no point did

either Ms. Briggs or Mr. Briggs offer any resistance.

32.     Ms. Briggs asked what was going on, but received no answer.  She then began to

hyperventilate while lying face down on the floor.  A female Officer asked Ms. Briggs if she

needed an ambulance.  Ms. Briggs responded that she did not need an ambulance and again asked why the police were in her apartment.

33.      After forcing the Plaintiffs to lie handcuffed on the ground for a period of time, the Officers allowed Plaintiffs to sit on chairs, still in handcuffs.  They took Mr. Briggs to a bedroom to question him then brought him back to the living room where approximately three officers guarded him and Ms. Briggs.

34.      Ms. Briggs requested several times that the handcuffs be removed because they were hurting her wrists, but Officers refused to do so, telling her they would remove the handcuffs when they were finished with their search.  After approximately fifteen minutes, the officers removed Plaintiffs' handcuffs.

35.      At all times, Plaintiffs remained polite and respectful to the Officers.  They did not curse or shout at them.  They complied with every order the Officers gave.  The two Plaintiffs were vastly outnumbered by the 13 Defendants.  Moreover, the Plaintiffs were, at the time, a 54-year-old woman and a man a few days shy of his 56th birthday with back problems that, as the Officers could clearly observe, made him unable to move quickly from a standing position to lying face down on the floor without obvious difficulty.  It was clear to any reasonable Officer that neither Ms. Briggs nor Mr. Briggs posed any threat of violence or escape.  There was no need or justification to use any physical force whatsoever in restraining them, to point guns at them, to keep them in handcuffs for fifteen minutes, or to forcefully shove Mr. Briggs to the ground when he was clearly attempting to comply with the Officers' orders.

**D.   Officers Continue Searching After It Becomes Clear That They Are in the Wrong Apartment.**

36.      After handcuffing Ms. Briggs and Mr. Briggs, the Officers searched the apartment and questioned Plaintiffs.

37.     They took Mr. Briggs to a bedroom and asked him questions such as "where are the drugs?"  He asked: "What drugs?" and the Officers told him to make things easier on himself and to cooperate so that he would "do less time."  Incredulous, he could only ask: "Time for what?  I don't do drugs."

38.     Ms. Briggs was equally surprised when a female Officer finally—after Ms. Briggs' repeated inquiries—told her the reason they were in the apartment was that the police had been told by a Confidential Informant that drugs had been sold from the apartment.  Ms. Briggs replied that the Officers were in the wrong apartment.

39.     The Officers were indeed in the wrong apartment.  Plaintiffs do not use drugs, they do not allow drugs into their home, and they certainly do not sell drugs—as they told the Officers.  Ms. Briggs told the Officers many times that they were in the wrong apartment.

40.     After questioning Mr. Briggs, the Officers brought him back to the living room with Ms. Briggs.  Approximately three Officers remained in the living room to guard the pair, while the remaining Officers continued searching the kitchen and the two small bedrooms.

41.     It was apparent to the Plaintiffs that shortly after forcibly entering apartment 303, the Officers realized they were in the wrong place because the search became perfunctory and half-hearted.  For example, in the kitchen, which is adjacent to the living room where the Defendants were standing guard over the Briggs, Officers seemed to be going through the motions of their search, simply opening and closing cabinet doors and drawers but not doing anything to search their contents.  Nonetheless, the Officers continued to search even though they had reason to know they were in the wrong place.

42.     Likewise, when Ms. Briggs returned to her bedroom after the Officers finally left, she should see that the Officers had only disturbed one drawer—the top drawer of her dresser—

12

and had turned her purse upside down to spill out its contents.  The three other drawers in the dresser, the three drawers in a plastic storage device in the open area in Ms. Briggs' bedroom, the closet, and the armoire all remained undisturbed, and the rest of the room was essentially untouched.

43.     The second bedroom, which contained several unopened moving boxes filled with the belongings of Ms. Briggs' youngest son (who does not live with her and had not had access to the apartment since Ms. Briggs moved in) was where one group of Officers concentrated their earliest searching efforts.  Officers ransacked the bedroom, opening a few boxes and crates, dumping boxes out onto the ground, and pulling out some drawers and emptying their contents onto the ground.  It took the Briggs several hours to clean up after Officers left.

44.     Yet it was clear to Plaintiffs, upon observing the room after the Officers left, that the search of this room as well had quickly became perfunctory—and that the only criteria used by Defendants was the ease or difficulty necessary to access an area or container.  For example, the room contained a trunk with a hutch on top of it, and several boxes were blocking the closet.  Yet it was clear to Ms. Briggs after the Defendants left that they had not opened the trunk, closet, or most of the boxes in front of the closet—leaving these items undisturbed.

45.     Moreover, during the search, Mr. Briggs heard a female officer say to other Officers that they must have gotten "the wrong place."  The searching, at least in the second bedroom, continued even after this, however.

46.     The Officers found a pack of Top-brand cigarette rolling papers in the top dresser drawer in Ms. Briggs' bedroom.  Officers asked Ms. Briggs if she used them to smoke marijuana.  Ms. Briggs told them the truth: that she is a smoker and rolls her own tobacco

cigarettes when she cannot afford factory-made cigarettes, but that she does not use marijuana. Officers did not pursue questioning about or seize this perfectly legal item.

47.     In the final minutes of the search, the Officers also found a shotgun shell in one of the moving boxes in the second bedroom. Ms. Briggs explained that the moving boxes belonged to her son—who has never been to the apartment—and that she had not unpacked his boxes after she moved to this apartment.  She did not know where her son had found the shell, but speculated that he might have found it on the street.  One Officer threatened Ms. Briggs with arrest, saying he could have her "locked up" for having the shell in her apartment.  The shell was seized but no arrest was made.

48.     Once the Officers were aware that they were in the wrong apartment, their continued questioning of Plaintiffs and searching of the apartment was unreasonable.

49.     The Officers left the apartment approximately thirty to forty minutes after they arrived, after demanding, in a very "nasty" tone, that Ms. Briggs sign something, without explaining it or what it meant.  The only item seized was the shotgun shell.

**E.   <u>The Entry and Search Were Unreasonable In Light of the Warrant, Affidavit, and Underlying Investigation.</u>**

50.     No reasonable police officer with knowledge of the warrant and/or the supporting Affidavit would have believed:

    a.   that the warrant authorized a no-knock entry;

    b.   that it was reasonable to force the door open with a battering ram within two to three seconds of first demanding entry;

    c.   that it was reasonable to continue pointing guns at Ms. Briggs and Mr. Briggs, inflicting distress on the Plaintiffs in doing so, even after it was clear they posed no threat; or

    d.  that it was reasonable to force Ms. Briggs or Mr. Briggs to the ground (violently

so in Mr. Briggs' case), handcuff them without ascertaining whether they would

have cooperated peacefully with the search (as they in fact did), or keep them in

handcuffs long after it was obvious that they posed no threat of violence or escape

particularly given the Officers' overwhelming numbers.

**F.  Physical, Emotional, and Financial Effects of the Incident on Plaintiffs.**

51.    The Officers' conduct was terrifying to Ms. Briggs and Mr. Briggs.  They feared for their safety when the Defendants without warning broke down the door with the battering ram, burst into the apartment, and pointed their guns at plaintiffs, and Mr. Briggs feared for his safety when he was shoved to the ground.  Both Ms. Briggs and Mr. Briggs continued to fear for their safety in the days, weeks and even years afterward when they have had to live without an appropriate door and—for a time—with no door at all.

52.    The night of the raid, Ms. Briggs was shaking much of the evening from the shock of the events.  Neither Plaintiff could sleep at all that night.  Ms. Briggs was scheduled to take a test the following day for a potential job opportunity, but she was unable to go to the test site because she had not had any sleep.  Both Plaintiffs got very little sleep in the following days and weeks because of the continuing trauma caused by the Officers' conduct.

53.    Mr. Briggs had difficulty sleeping for some time after the incident, which was frequently on his mind and made him nervous and anxious.

54.    Being shoved down and forced to lay on the floor with his hands cuffed behind his back also aggravated his pre-existing back injury, as his pain increased after the attack.

55.    Ms. Briggs estimates that she slept no more than an hour or two per night for the next two weeks.  And her sleeping problems continued much longer.  For months following the incident, Ms. Briggs was not able to sleep more than two to three hours at a time.  She could not

bring herself to rest in her bedroom and spent the night on the couch for approximately the next eight months.  Eventually, her brother convinced her to talk to the doctor about getting medication to help her sleep, which she ultimately did, though these did little to help her.  To this day, even if she goes to bed at 10:30 or 11:00 p.m., she still wakes up at 2:00 a.m. and has trouble falling back to sleep as a result of this incident.

56.     Before the police raid, Ms. Briggs usually slept without disturbance from approximately 10:30 or 11:00 p.m. until approximately 7:00 a.m.

57.     Ms. Briggs suffers from ongoing anxiety and fear as well.  Beginning after the police break in and continuing to this day, she sleeps with a chair propped up under the doorknob of the front door out of fear of someone breaking in.

58.     After the raid, Ms. Briggs also suffered from increasingly frequent headaches, which continue to this day.  In the short term after the raid, she experienced trouble eating and an increase in her blood pressure, which she believes resulted from the shock and anxiety that this incident caused her.

59.     Plaintiffs' anxiety was heightened by the physical insecurity that resulted when their door was destroyed.  The Officers' battering ram split the apartment door in half, leaving it impossible to fully close.

60.     Although one of the Officers assured Plaintiffs that an Officer would remain behind until the door was fixed, that Officer quickly left after simply calling the apartment building maintenance line, leaving the apartment unprotected with a broken door.

61.     Building maintenance staff eventually placed pieces of plywood over the broken door that evening, and Plaintiffs stacked boxes against the plywood as a makeshift barricade.

This flimsy contraption remained in place for three days and four nights, leaving Plaintiffs unprotected, vulnerable, and frightened in their own home.

62.     During those three days, Ms. Briggs and Mr. Briggs rarely left the apartment, with one or both of them remaining home to guard against possible break-ins.

63.     Ms. Briggs was told that it would take the apartment complex ten days to replace her door with one like the strong metal door she had before the incident.  After spending three anxiety-filled days in the apartment without a proper front door, Ms. Briggs simply could not wait a full ten days without a door.  One of her sons interceded on her behalf to call the rental office and procure a door which arrived on the Tuesday following the Friday evening raid, but it was wooden, flimsy, and insecure.  This stood in contrast to the sturdy, secure metal door that the Officers destroyed.  The replacement door, which remains to this day, does not fit correctly in the doorway, and even when "fully" shut it has a large, noticeable gap at the top.  Ms. Briggs has had to put tape on the inside of the door to prevent excessive airflow.  These deficiencies have increased Ms. Briggs' electric bills for heating the apartment in the winter and cooling it in the summer.

64.     The replacement door also does not sit squarely in the doorframe.  When the door is fully closed, the door is not flush with the frame.  For instance, even with the door closed, a person outside Ms. Briggs' apartment can still see a large part of the inside edge of her door frame—the area that, in a fully functioning door, would be visible only if the door were partially or fully open.

65.     Even after the broken door was replaced, neither Ms. Briggs nor Mr. Briggs felt safe in the apartment.

66.     Ms. Briggs' obviously weaker door made her apartment a target for theft, which she experienced on November 4, 2012, when her apartment was broken into and several personal belongings stolen while she was at work.  Ms. Briggs' neighbor heard the break-in and called the police.  Ms. Briggs filed a police report (Report Number 12155629) regarding this break-in.

### G. Complaints with Office of Police Complaints and Office of Risk Management.

67.     Three days after the raid, on January 23, 2012, Ms. Briggs complained to the Office of Police Complaints ("OPC") about the breaking down of her door and unreasonable search of her home.

68.     On January 25, 2012, Ms. Briggs filed an official Complaint Form with the D.C. OPC, reporting and identifying the stress and elevation in blood pressure that she already was experiencing as a result of the events of January 20, 2012.  This Complaint Form referenced her earlier complaint by number and identified 12-0181 as the OPC Control Number for Ms. Briggs' complaint.

69.     Ms. Briggs was interviewed by OPC on February 9, 2012.  In an April 5, 2012 letter, the OPC informed Ms. Briggs that her complaint had been dismissed on March 31, 2012. No specific reason was given except that the OPC "concluded that there is no reasonable cause to believe that police misconduct occurred in the case."

70.     On May 8, 2012, Ms. Briggs' counsel sent a notice of claim to the D.C. Office of Risk Management ("ORM").  ORM acknowledged receipt of the notice of claim on June 19, 2012, and assigned the case Claim No. 1200351-000.  On July 10, 2012, Claims Specialist LaShonda Wright sent Plaintiffs' counsel notice that ORM had "determined" that the District of Columbia was not liable in this case and that "there [was] no proper basis for recommending allowance of Ms. Briggs' claim" because the MPD "obtained a proper search warrant based on probable cause."

71.     On September 5, 2012, Plaintiffs' counsel responded to Ms. Wright with a letter requesting that ORM reconsider its conclusion.  This letter set forth in detail the legal bases for Ms. Briggs' claims, including the fact that—despite the implications of Ms. Wright's letter—the mere existence of a warrant does not preclude claims for police misconduct or give officers carte blanche to treat members of the public however they see fit.  After receiving no response, on October 13, 2012, Plaintiffs' counsel wrote to the director of ORM, requesting review of Ms. Briggs's case. Eric Glover, the manager of the Tort Liability Division at ORM, responded on October 23, 2012 with assurances that the case had received a full investigation and reiterated that ORM concluded that "the actions of the MPD were lawful and as such, your client's claim was denied."

72.     Plaintiffs' counsel submitted a Freedom of Information Act request on October 31, 2012, requesting all agency records obtained or created in connection with the ORM investigation of Ms. Briggs' claim.  On November 27, 2012, Plaintiffs' counsel received responsive documents. The majority of the responsive pages were copies of correspondence between Plaintiffs' counsel and ORM. Only eight pages related to the investigation, showing no indication of anything more than a cursory investigation into the existence of a warrant.

73.     On December 15, 2012, Plaintiffs' counsel again requested that Ms. Briggs' claim be reviewed.  ORM did not reply.

## CLAIMS FOR RELIEF

### Claim I: Violation of Fourth Amendment Rights – Failure to Knock and Announce

74.     The Defendant Officers failed adequately to knock and announce, violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches. Violation of that right is made actionable by 42 U.S.C. § 1983, and the

Defendant Officers are jointly and severally liable to Plaintiffs for compensatory and punitive damages.

75.     At the time of the search, it was clearly established as a matter of law that, absent exigent circumstances, police officers are required to knock and announce their presence and purpose and then wait a reasonable amount of time to give the occupants of a residence time to open the door.  No reasonable police officer would believe that two to three seconds after announcing his/her presence was enough time to constitute an active or constructive refusal of admittance.  Further, the Officers did not report any exigent circumstances that would give any reasonable police officer justification for an immediate and forceful entry in this case.

## Claim II: Violation of Fourth Amendment Rights – Excessive Force

76.     One of the Defendant Officers used excessive force in shoving Mr. Briggs to the ground as the disabled 55-year-old Plaintiff was attempting, with extreme effort, to comply with the Officers' demand and indeed was in the process of doing so.  This Defendant Officer thus violated Mr. Briggs' rights under the Fourth Amendment to the United States Constitution to be free from the use of unreasonable force. Violation of that right is made actionable by 42 U.S.C. § 1983, and this Officer is liable to Mr. Briggs for compensatory and punitive damages.

77.     Defendant Officers used excessive force handcuffing Plaintiffs—and keeping them handcuffed—long after it had become obvious that neither Plaintiff posed any threat of violence or escape, and after Ms. Briggs repeatedly asked that the handcuffs be removed because they were causing her pain.  The Officers thus violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from the use of unreasonable force. Violation of that right is made actionable by 42 U.S.C. § 1983, and the Defendant Officers are jointly and severally liable to Plaintiffs for compensatory and punitive damages

78.     Defendant Officers also used excessive force in pointing their guns at Plaintiffs upon entry and continuing to point them at Plaintiffs as they were complying with, and even after they had already complied with, Officers' order to get onto the ground.  The Officers thus violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from the use of unreasonable force. Violation of that right is made actionable by 42 U.S.C. § 1983, and the Defendant Officers are jointly and severally liable to Plaintiffs for compensatory and punitive damages.

79.     At the time of the search, it was clearly established as a matter of law that:

a.  it is an unreasonable use of force to shove someone to the ground when he poses no immediate threat of safety to the Officers or others, is not attempting to flee, is not being arrested, is not disobeying an Officer's order, and in fact is in the process of complying with an Officer's order;

b.  it is an unreasonable use of force to physically restrain residents of a premises being searched after it has become obvious that they do not pose any danger to the officers; and

c.  it is an unreasonable use of force to point a gun at an unarmed, peaceful person who submits to detention without resistance.

**Claim III: Violation of Fourth Amendment Rights – Unreasonable Search**

80.     The Defendant Officers failed to cease their search after discovering that they were in the wrong apartment, violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches.  Violation of that right is made actionable by 42 U.S.C. § 1983, and Defendant Officers are jointly and severally liable to Plaintiffs for compensatory and punitive damages.

81.     At the time of the search, it was clearly established as a matter of law that officers may not continue to search a residence pursuant to a search warrant after they are aware of the risk that the premises named in the warrant are not the premises intended to be searched. No reasonable police officer would have believed it was appropriate to continue searching the apartment after it became clear that he or she was in the wrong place.

### Claim IV: Negligent Infliction of Emotional Distress

82.     Defendant Officer Turner failed to exercise reasonable care in the investigation leading up to the Affidavit for the warrant to search Plaintiffs' apartment, leading Officers to raid the wrong apartment.

83.     The Defendant Officers failed to exercise reasonable care in their execution of the search warrant in the manner described above.

84.     As a result of this negligence, Plaintiffs were placed in danger of physical injury—and feared for their physical safety—when 13 armed officers broke down the apartment door with a battering ram without warning, burst into their home, and pointed guns at Plaintiffs; when Mr. Briggs was shoved to the ground; and when Plaintiffs were forced to live in an apartment without a door for several days and later to live in an apartment with an insecure replacement door.

85.     As a result, Plaintiffs suffered serious and verifiable emotional distress.

86.     As a result of this negligent inflicion of emotional distress, the Officer Defendants are liable for damages to Plaintiffs.

**Claim V: *Respondeat Superior***

87.    Defendant the District of Columbia is liable for the torts of its employees committed in the scope of their employment.  Where any employee is found liable to Plaintiffs for Claim IV, the District of Columbia is also liable under the doctrine of *respondeat superior.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)    FIND that the actions of Defendants violated the rights of Plaintiffs under the Fourth Amendment to the United States Constitution and constituted the negligent infliction of emotional distress;

(b)    ENTER JUDGMENT awarding compensatory and punitive damages against Defendants in an amount appropriate to the evidence adduced at trial;

(c)    ENTER JUDGMENT awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988; and

(d)    GRANT such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

Dated: January 20, 2015                Respectfully submitted,


                                       */s/ Katherine I. Funk*

                                       Katherine I. Funk (D.C. Bar No. 448587)
                                       Kathleen M. Clair (D.C. Bar No. 499072)
                                       CROWELL & MORING, LLP
                                       1001 Pennsylvania Ave., NW
                                       Washington, DC 20004
                                       202-624-2500
                                       kfunk@crowell.com
                                       kclair@crowell.com

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation of the Nation's
Capital
4301 Connecticut Ave., N.W., Suite 434
Washington, DC 20008-2368
202-457-0800
art@aclu-nca.org

*Attorneys for Plaintiffs*